Good morning, your honors. Olu Orange on behalf of plaintiffs and appellates. I'd first like to start off by requesting that I be able to reserve about six minutes for rebuttal. I don't know how the time is going to be divided by opposing counsel, but it seems that there are three of them that are going to speak, and so I'd like to try to have enough time to rebut what they say. The clock counts down, so you keep a lookout, and we'll try to help you, and we'll make sure that everybody gets a chance to say what they need to say. Thank you, your honor. I'd like to start by saying that, or pointing out for the court, that in Defendant Cruz's August 23rd, 2013 reply brief, pages three and four, he concedes the jury's excessive force verdict. In the city's joinder, filed on that same day, the city joins in that concession. So as far as the excessive force verdict goes, it's been conceded that there's been appropriate evidence to support it. In addition to that, that excessive force verdict was accompanied by a malice finding. What that brings us to then is the issue of whether or not, in cases where civil rights injuries cause death, there should be pre-death pain and suffering damages awarded to the decedent's estate. We would submit that in every other circuit to speak on this issue, and there are five of them, the circuit courts have decided that pre-death pain and suffering, or similar general damages, some of them characterized as loss of life, should be awarded. And we would ask that the Ninth Circuit join the other circuits in doing the same thing. And as I understand it, at the time that the district judge was dealing with this, there were district courts in our circuit going both ways, and our circuit simply has not yet spoken to the question. That is correct, Your Honor. Our circuit has not spoken to the question. The California Supreme Court has not spoken to the question. It has explicitly left the door open, and the United States Supreme Court has left the door open. So the only circuits that have spoken to the issue are the Second Circuit in McFadden, the Seventh Circuit in Bell, the Eighth Circuit in Westcott, the Tenth Circuit in Vary, and the Eleventh Circuit in Gilmere. And as a matter of fact, the first circuit to do it was the Second Circuit in McFadden, and that was more than 30 years ago. That was in 1983. And so the Ninth Circuit just hasn't, I guess, had the issue come up for decision so that the Ninth Circuit could speak on the issue. Well, here we are. Assuming we agree with you as a matter of law, is there enough evidence to support a verdict for a million dollars? Yes, and I'll tell you why. The evidence that was presented to the jury suggests that Mr. Chaudhry, from the time of the first shooting, the first bullet fired until the time that the Code 4 call went out, the all good call, essentially, was alive for approximately eight and a half minutes. During those eight and a half minutes, Mr. Chaudhry. Can I stop you right there? Yes. Where do we look to verify that? Where do we look at that? Okay. At reporter's transcript for January 20th, 2011, in the AM transcript, Officer Romo says he finishes running the ID and receives the MDC response at 4.03 and 34 seconds AM. Okay? That's the first bookend. And keep in mind, Officer Romo also testifies that at the time he hears the first shot, it is right after he receives that response and is in the process of exiting the police car. Can I just, before you continue with the record sites, so just to make sure I got what you were saying correct, you say that between the time the first shot was fired and the time of death was eight and a half minutes? Yes. I definitely need the record sites for that. This is what the evidence that the jury heard suggests. So the first, the starting point, is that 4.03 and 34 seconds. Because Officer Romo says, again, that he was stepping out of the car right after receiving the return on the ID run. At the time he hears the first bullet. Okay? Do you have a page number on January 20th, 2011, for that? Yes, it's 110, line 20, through 111, line 1, as well as 82, lines 2 through 14. Okay. Okay? Now, then there are things that happen in between, of course, the shooting incident. And then for the reporter's transcript of January 20th, 2011, afternoon, the afternoon transcript, at page 5, lines 4 through 19, Officer Romo details how the all safe call goes out at 4.12 a.m. And what he says is that when that all safe call goes out at 4.12 a.m., he did not necessarily feel safe yet, and that he's not the one who made the all safe call, but it was his partner, Officer Cruz, who made the all safe call. Okay? Now, do we understand, then, you're saying that when Mr. Chaudhry died, is coterminous with the all safe call? Is that what you're saying? I'm saying that that is what the evidence that the jury heard suggests. There was never testimony as to exactly when Mr. Chaudhry died. Okay, so I guess that's what I'm trying to understand, because I think there was some testimony that he was, you know, he got up and fell, but I understood that it was a matter of seconds, not minutes. Where is my understanding mistaken? The shooting itself was a matter of seconds. As a matter of fact, in closing argument, I argued that the shooting itself took five seconds. Okay. And then thereafter, what I argued was, is that the last thing that the officers say they saw, as far as Mr. Chaudhry, was him struggling to get up, was him rolling over on his side, and him making gurgling noises. And what I said to the jury is, is that you've got to look at that amount of time, the complete amount of time, and figure out how much money to award for pain and suffering. Okay, well, let's assume for a minute that, say it's four minutes. Let's be an arbitrator. Say it's four minutes. Certainly. I guess I'm struggling with the same thing that my colleague is. Not so much whether the law ought to be what you say, but in terms of the damages. We have a case, the Cook v. Rose Island Sand and Gravel Company case, where the court approved a $35,000 award, which was reduced from $100,000 for two and a half minutes of drowning. Now, that's very different than being shot, I grant you that. But how do we get from that to a million dollars? I know there's an inflationary factor as well, but help me with that. Certainly. Well, one of the key things from that case is that the Ninth Circuit said that it doesn't observe a stopwatch rule, as far as calculation of damages. The other key thing from Cook was that the Ninth Circuit recognized a heightened awareness that happens when one is drowned. Okay? Now, what we would suggest is that certainly for each bullet that Mr. Chaudhry took, and I'm sorry to be so graphic because his father and his brother are in the audience, but certainly for each bullet that Mr. Chaudhry took, there was an awareness of impending death. He took three of them. Even after he took the bullets and fell, and while he's on the ground struggling to get up, certainly he's aware that he's going to die. So as far as a heightened awareness coming from Cook, it's present in this case for sure. Now, the case that we would cite, and actually was cited by the defense too, is Fishing Vessel Carol and Jean. Okay? In Fishing Vessel Carol and Jean, the court found it appropriate to submit to the jury for damages determination a situation where it was based solely on a mayday call. They never even found the boat or the bodies. The testimony was that of crew members who had been before on the vessel and suggested that there was nothing that could have moved around based on the rollover of the boat, and that alone was enough to send the question of how much money should be awarded in damages to the jury. Here we have eyewitness testimony. Here's where I am on this, and I'm not purporting to speak for my colleagues. Certainly. I'm inclined to join the other circuits as to the rule, but I'm inclined to send it back to the district judge for the district judge in the first instance, at least, to entertain a motion for a remitter. He heard all the evidence. He was there. For us, it's a bare record. A million dollars seems a little high. Is there some reason we shouldn't just send it back to the district judge and be the first one to look at this? This is going to be a bold suggestion, but, Your Honor, we would ask as plaintiffs that this court make the determination, and the reason we'd ask that this court make the determination is because if it goes back for a remitter and a party disagrees, we come right back here for this court to make the determination. I have clients who are suffering. They want closure. They've fought the battle to bring this question before this court so that the other people who live in the circuit who may be confronted with similar situations can have the benefit, hopefully, of a rule that will help them. Well, you know, I think you probably got a lot of sympathy for the rule, but what exactly should we look to? If we assume the burden that you would have us assume, which in this case is as a fact finder or looking at the facts before the district court, what in the record, aside from what you've given us here, should we be looking to? Well, in addition to the time frame, the court should also look at the gravity and the magnitude of harm. This was a 5'11", 140-pound gentleman, approximately, who took three hollow-point bullets from a .45-caliber handgun. And he took them in succession, was still standing, was certainly confused, afraid, in pain. The gravity of harm here is significant. And I would suggest to the court that there is another case, and the name of it escapes me right now, but Allen. The case is Allen. We cited it in our brief, Allen v. Los Angeles. In Allen v. Los Angeles, it wasn't a death case, but it was a case where a woman who was experiencing a mental episode was shot multiple times. She was tasered. She was awarded $3 million. The length and the duration of the incident was, I don't recall whether it was longer or shorter than what we suggest the duration was of this incident, honestly, but I do recall that it was somewhere in the same ballpark. $3 million is what she was awarded. Being shot with police bullets is, I hate to say it, worth a lot of money. And that's what the courts should look to, duration, gravity of harm. Let me ask you a slightly different question that follows up on Judge Fletcher's question. If we did send it back for the district court to do this review in the first instance and it came back up, what standard of review would we apply? Would it be some kind of a clear error standard that we have to have deference, or would we just review it de novo anyway? I think you would review it de novo anyway with, actually, I don't know the answer to that question, because I know right now reviews de novo but with deference to the jury's findings, unless there's monstrous or clear error. But if it goes down and comes back up on a remitter, I don't know what the status of the jury's findings and the deference there happens to be. The deference owed to the district judge's initial call on whether to, yeah. Right. It adds another level that may make it a different situation. And I'm sorry that I don't know the answer to that question. Okay. So as far as sufficiency of the evidence to support the million dollars, I hope I've answered all the questions there. As far as what the other circuits have done, as far as pre-death pain and suffering damages, there's a lot to discuss. Do I need to? I think you probably made your point there in the briefs. Maybe go on to the other issues. Thank you, Your Honor. I appreciate that. At least that's from my perspective anyway. Okay. What the judge did here at the district court level in instructing the jury was give them elemental instructions. He instructed them to basically make determinations as to whether or not there was an excessive use of force, which they did, and also whether or not there was malice, which they did. We submit that based on those two determinations, the jury actually decided the parent's claim for 14th Amendment deprivation of familial association. Because in Porter v. Osborne, the standards for 14th Amendment deprivation of familial association is an excessive use of force that is done with a purpose to harm that is unrelated to any legitimate law enforcement objective. Can you help me with this, please? Sure. At ER 557, my understanding was that the jury found that Cruz unreasonably killed Osborne, in the sense they found it was reckless, oppressive, or malicious, but they did not necessarily find that he acted with an intent to harm. Am I missing something there? Is that just kind of automatically included in the three things that they did find? Our argument is that it's automatically included in the three things that they did find, and the reason is because as the party that obtained the jury's verdict, we are entitled to the all-favorable inferences that flow from that verdict. And to the extent it was reckless, oppressive, or malicious, we would say that we're entitled to the finding that it's malicious, and even if we weren't, the finding that it was done with, I think the instruction said a complete indifference to the value or safety of Osborne's life or complete indifference to his life or safety, would mean that what was done was done without any legitimate law enforcement purpose and with a purpose to harm. I may be missing something, but I think the argument for the other side is not so much to contest that there's 1983 liability, but it's duplicative of the state wrongful death claim. That is the argument on the other side, and I'd like to address that. In that regard, I'm going to start here. Even if it's duplicative, still the court should send it back for entry of judgment on the parent's claim, and if damages are precisely duplicative, not award damages for both. We would contend that damages are not duplicative. First of all, whenever there's been a 1983 injury, compensatory damages are mandatory. The court has held that in Smith v. Wade. This court in Hazel v. Crowfoot has made the same determination. That means that there must be compensatory damages awarded for that violation. What are the different components of damages that they would have recovered on that claim versus the state wrongful death? They would have recovered damages for their pain and suffering, their grief for the loss of their son. The jury was instructed in this instance that they could only award damages for loss of companionship. That's it. They were told no damages for grief, no damages for the parent's pain and suffering. 1983 calls for the full panoply of damages to be available in situations where there is a civil rights injury. There certainly was one here. And the parents should get a damages-only trial for the pain and suffering that they experienced in losing their son. As far as the difference between the two statutes is concerned, one that is duplicative, does the fact that one permits or indeed requires the payment of attorney fees and the other does not constitute a difference of which we should take notice? Yes, it does, because that means that the damages are not 100 percent congruous. Attorney's fees are a species of damages. In addition to that, Smith v. Wade raises an interesting point. I know in Smith v. Wade the argument was really about whether or not there could be punitive damages as well as compensatory damages, and the court found that because punitive damages are always discretionary, compensatory damages are always required for a 1983 injury. However, that does raise the question as far as whether state law damages may also be discretionary. And state law damages, depending on where you are, are discretionary as far as compensatory damages go. So what that means is that unless this 1983 rule that the parents get the pain and suffering is put in place, you could have a situation in a jurisdiction where it's discretionary as to whether or not there's an award of damages for a civil rights injury. That can't happen. Under state law? Under state law. Listen, you'd ask to save about six. We're well down. Let's hear from the other side, and we'll make sure you get enough chance to respond. Thank you, Your Honor. I appreciate that. Good morning, Your Honor. Jules Zeeben on behalf of Officer Cruz. I would like to request 10 minutes, and my colleagues will be sharing the other 10 minutes, five minutes apiece. So tell me who you're going to give me all the suspects here. Okay. Blythe Cough is representing the city of Los Angeles. And Allison Turner is representing the county of Los Angeles. So the county, that basically is the coroner. City of Los Angeles, that's. And how is the city of Los Angeles distinct from Cruz in this respect? Not much. We just had one cause of action that was separate, distinct, but I agree. Okay. Thank you, Your Honor. I'll address first the question of the pre-death, the evidence of the pre-death pain and suffering. Of course, this is a very, very unfortunate case, which we all take very, very seriously. When you're going directly to the evidence, do you agree that we should join the other circuits on this point? Well, I don't, Your Honor. I think that the more persuasive arguments and rationale have been laid out by the Eastern District of California in its cases and actually certain other cases in the Central District and Southern District. I will concede that the Northern District and most of the cases in the Central District and Southern District have followed the other circuits. I would state that the McFadden case and at least one of the other cases, I believe, in the Sixth Circuit, dealt with situations where the wrongful death statutes in those states did not provide for punitive damages whatsoever. So they were dealing with a scheme that actually was more inhospitable to the goals of 1983 on the compensatory side. But, Counselor, how do you reconcile California's bar on pre-death pain and suffering when the reality is the argument to sustain that is that you're better off to kill somebody than injure them. That doesn't make any sense, does it? No, I don't think it does. But the Robertson case addressed that and other cases in the Eastern District and indicated that there's going to be a 1983 suit notwithstanding and that that argument is not very logical from the standpoint of what happens in the real world. Well, I think this very case points out the logic. I mean, it's hard to reconcile how the purposes of 1983 can be served when, in fact, somebody who is injured, you know, that's worse for the city than somebody dying. That doesn't make any sense, does it? Well, from hindsight, that's exactly. You're correct, Your Honor. The hindsight result is something that does not appear to be logical. It does not argue that we should adopt the reasoning of other circuits, regardless of what our district courts are doing, and agree that 1983's purposes are inconsistent with California law on this point. Well, I think it's a close call, but, I mean, the California law is, as the legislature has set forth in 377.34 of the Civil Code, and they've revisited that question, I think, on four occasions since the 1940s. I do believe it's a very close call. There's a lot of logic and rationale. It's not one that we're entitled to make. Yes, you are, Your Honor, certainly. We'll take it that you're not conceding you would prefer that we adopt the rule of the district. Yes. Okay, got it. But I would point out that we believe, and we contend, that this case should not be the case where the rule changes, where the rule is adopted. The rule does change. Now go back to where you were about to make a point on evidence, and I interrupted you. Okay. Thank you, Your Honor. The evidence in this case is very unusual, because the plaintiffs at trial were not pressing the point that the decedent had survived a great period of time. In fact, they were making the opposite point in order to create an inference for the jury that liability should be placed on Officer Cruz in the city, because he had given no chance to the decedent to do anything other than be shot. Plaintiffs' counsel has admitted, and in his closing indicated, that all four shots were made with hollow-point bullets and made within a three- to five-second time frame. There was no evidence at all whatsoever in the entire case from any medical expert on behalf of the plaintiffs that there was any consciousness, and that's the key. It's not so much time of survival, but it's the consciousness of pain and suffering. And there were no interpretations of medical records, which militated towards there being any consciousness or that there be any survival beyond a few seconds. Counsel has admitted that the facts of the case, and again, quite unfortunate that you had a 5'11", 140-pound individual who was shot at close range with four hollow-point bullets. The expert testimony that did come in, which was not disputed by either side, but it came in from city coroners and from city medical officers, was that the decedent's spinal cord had been struck with at least two out of the three bullets. Another witness from the city also had testified that, in fact, and he agreed with the plaintiffs, yes, the decedent likely had gone down to one knee after the first shot and had fallen completely with the second and third shots. It would be, you know, our contention as far as interpretation of the law, that this case is more like the Gortra case, G-H-O-R-T-R-A, I believe it's 113-F-3-1-0-5-0, which was this circuit's case, I think Your Honor may have been the author, where there was a dispute as to whether a decedent had survived for ten seconds. And there was a summary judgment case where the Ninth Circuit affirmed a summary judgment that there was no pain and suffering, pre-death pain and suffering to be awardable and that the issue should not go to the jury, notwithstanding that there was a declaration from an expert on that plaintiff's side indicating that he likely survived ten seconds. You never moved for summary judgment on this point, right? We did not, Your Honor. You didn't move during the trial to say that he didn't live long enough to get any pain and suffering damage? No, but there was an objection to the instruction to the jury that that be considered as an element of damages. Okay. But so why just respond directly to counsel's assertion to us with some record citations that the jury could have inferred, it wasn't compelled to, but it could have inferred that he lived as long as eight and a half minutes after being struck by the first bullet? Well, in response to your question, Your Honor, I would actually cite, and I believe they're all on the record in our briefs now, to those, to the coroner, to the expert medical witnesses, but I would actually point in response to your question to the absence of any evidence. The burden is on the plaintiffs to establish some evidence of pre-death pain and suffering through a conscious experience. We all know that when paralysis kicks in, there's numbness and there's a lack of sensation. You're making nice jury arguments, which I'm sure I assume you did make in closing, but I'm saying the evidence is what it is, what we've got before us. Why couldn't a jury have inferred that he was in fact conscious because he was still alive for much of that eight and a half minute interval? Well, we contest the eight and a half minute interval because we don't think it's coterminous with the all clear being the time of death. Just go straight to respond to his argument. That's the argument he's put before us. What's your response as to why we shouldn't accept that? Well, the response is if you're referring to inferences, we would characterize it as conjecture and speculation and guesswork on the part of the jury, not that it would have been based upon any evidence and any facts. The only facts that were before the jury with respect to pain and suffering, well, there were no facts as to consciousness of pain and suffering. The only facts there were was that he suffered paralysis, and that was brought out by plaintiff's counsel through the city witnesses, that he was shot with hollow point bullets intended to cause the maximum damage, is how it was argued to the jury, and that it did cause the maximum damage, that there was no way that he could have been even standing after the first three shots. None of that, though, negates the inference the jury could draw, that he was certainly conscious of the fact that he had been shot three times and was going to die as a result of his injuries. Well, but I don't think that there's any affirmative evidence of consciousness. Well, I mean, that's hard to say. I mean, he's dead, so he can't tell us. The only other recipient witnesses are the two officers who are right there, and I guess there's some other witnesses, and we know that he fell. We know that we have evidence that he was gurgling after he fell. We know that there was some movement after he fell. We know that the all-clear wasn't given for eight and a half minutes. I think a jury could infer consciousness of both injury and impending death. I understand Your Honor's points on that. I would just point out that in every other case that I've read on this subject, the way that the plaintiff's attorneys approach it is to put on the stand some kind of medical testimony. Certainly, there were medical records that could have been reviewed. There's other expert testimony upon inferences that could be made if the testimony were there. Plaintiffs were intent on showing that he was shot and killed immediately. With hindsight, I think that when getting into the damages issue, with hindsight, they are now. . . We're in this interesting position. The plaintiff's evidence is that he was shot very quickly, rapid succession. It's your witness that gives the support for it took a while. Right. And I would point out that in the reply brief for Plaintiff's counsel, he I think correctly points out that the jury didn't believe anything that my witness, my client, said from start to finish. I'm not sure that's true. I think that the jury very well could have come back with a $700,000 verdict for excessive force, believing exactly what your witness said. Well, I mean, I don't want to disagree with Your Honor's inferences there. I would go into a question that Your Honor asked earlier. It would be, on behalf of Officer Cruz, I think a remand would be appropriate. And going to another question, I think it would be a substantial evidence review by Your Honors if it came back up for appeal. Okay. So moving to the. . . I'll save the rest of your time for your colleagues. Oh, I'm sorry. Yes. No, I'll pass on to my colleague. Thank you, Your Honor. What's your last point? Just make sure I understand what it would have been. I was going to agree or rather just to emphasize the duplication of damages as to the wrongful death and the loss of familial. . . Thank you, Your Honor. I'm sorry. We can ask her. I'm sorry. Judge Watson might want to. . . Well, I can't ask you, though. I'm sorry, what? Well, let's. . . Yeah, I just. . . Your last statement. I'm confused. So are you. . . Did you say that you agree that there isn't total overlap in the damages? No, I believe that there is. There is? Yeah. Okay. And why is counsel wrong, then, on the pain and suffering component? Well, the pain and suffering. . . The evidence to support the $700,000 to the parents of the decedent was replete with evidence of their grief. That's all that there was, actually. He had. . . The decedent had no job. He was on public support. He was in a home. He had autism. He was not greatly educated. And there was no other traditional component of a wrongful death recovery, other, frankly, than the loss of rather the grief for the parents. And I think virtually all the testimony in the record was the grief that they were feeling, even though he didn't live with them for years, and, in fact, there was lots of disputes between them. But is your argument that grief, parental grief, is not cognizable under 1983? I'm not sure where this argument is going. Well, you know, I believe that it probably is cognizable. It's not cognizable under the wrongful death statute, is it? Right. It is technically not. Yeah. So maybe it is not duplicative. Even putting to one side the attorney's fees argument, it may not be duplicative because the 1983 coverage is broader. I'll let my colleague expand on that further. But as to the attorney's fees, I think they were already awarded as if there was a viable 1983 action through 1988. We're in part. Okay. Now, if you could reset to part 13, please. Good morning, Your Honors. Glyde Bock on behalf of the City of Los Angeles. And as I pointed out before, the city and Cruz essentially ended up filing a the city joined in the Cruz's brief. So the one cause of action that was asserted really solely against the city was this cause of action for conversion, which was dismissed before trial. And it was briefed in the opening brief. And I would just like to recap that I think, as I point out in the brief, the first issue is whether or not there's a cause of action at all. And I would submit that essentially they've not even alleged conversion. There's truly nothing other than the gathering of the evidence at the scene of the incident. And even if there were, more importantly, it's absolutely immune. The appellants are trying to sort of recast it as somehow tied up with the shooting, which the city is not asserting would be subject to an immunity. It's wholly discreet, which is the post-shooting investigation. And that's the gathering of the evidence and the clothing of the decedent, which was necessary for the investigation that was conducted by the LAPD. That is textbook immune behavior, immune conduct by the LAPD. And I think it's a pretty straightforward argument under Government Code 821.6. So unless Your Honors have any further questions. As to the $700,000, you're not appealing that? The wrongful death, essentially that. The award of $700,000 for the excessive force, you're leaving that alone? It's actually not for the excessive force, that was for the wrongful death of the parents. Okay, but you're leaving that alone? Right, as a matter of law, our arguments have been withdrawn. That's not the excessive force verdict. The excessive force verdict is definitely an issue, and that's the 1983, which was awarded to the estate of Usman. And for the reasons that was pointed out by my co-counsel, definitely that is in dispute. It's only the $700,000 wrongful death verdict. Yeah, the death wasn't wrongful unless excessive force was used, though, right? Well, but as a matter of law, though, it's the state. You're confusing me. Okay. Yes, you are. I'm sorry. There was a state tort wrongful death claim brought by the parents, the Chaudhry's, and then there was separately and apart a 1983 action brought by the estate of Usman. Right. That 1983 verdict is definitely. The million dollars. Right. You're not contesting the $700,000. Correct. Correct. Okay, thank you. Does the panel have any questions for the State? Thank you. Good morning. May it please the Court, Alison Turner for the County of Los Angeles's Coroner's Office and its employees. Our position here is a little different than everybody else's. We're here to defend summary judgment. The case against the county arose from the fact that the county did not notify Usman's family of his death soon enough for them to bury him according to the dictates of their religion. The facts are essentially undisputed in this case. The debate is the legal conclusions to be drawn from those facts. Why wasn't a jury entitled to decide whether the county acted reasonably in taking so long? On the negligence claim, reasonable diligence. Well, I guess it was, is it Government Code 27471 that plaintiff? Correct. Allegedly that imposes. That and the Health and Safety Code that has language of reasonable diligence in notifying. You know, reasonable people could come out differently on the question. I understand your client's arguments as to why they did everything that, you know, was reasonable under the circumstances. But I understand the plaintiff's argument as well. And why shouldn't that have gone to a jury, I guess, is my main question for you. I think that because I think of the way reasonable diligence has been approached by courts when that's the standard or reasonable attempt. And the context that I used in my brief was the search for witnesses in a criminal case. And reasonable diligence is a standard there as well. And the California Supreme Court stated, I think it was in the Cummings case, that you could have done more, that there were additional lines of inquiry you could have pursued, that you didn't succeed, none of these things. Let me just stop you because you said the facts are basically undisputed, but I'm not quite sure that that's correct. Am I right? By saying reasonable is disputed. Yeah. But am I right in remembering that they say that the address that ultimately was used to contact his parents was in the file or in the county's possession and it was there all along, but basically just nobody found it? No, they didn't get to it. What they did was they took the card from his pocket, which had the address of the Celebration Theater, and they stored it there because that's what was listed in his identification card as his address. And it was the same address that the LAPD had for him. And in both cases, there was nobody listed for emergency contact. So with the Celebration Theater, they went there. They wrote a letter there. They telephoned there. They e-mailed there. They got a letter back eventually from the Celebration Theater directing them to a Chaudhry's somewhere in South County. They went and pursued that lead. It was no relation. Then they went back, and they went to prior addresses. That's when they found it. But ultimately, to get back to Judge Watford's question, as I understand it, in Davila versus County of Los Angeles, the court indicated that the Government Code Section 27471 makes clear that a coroner has a mandatory duty to make a reasonable attempt to locate the deceased's family. When you look at the fact that the government seems to concede that they'd overlooked an address, it was there. Now, whether it was unreasonable, that's a question of fact. Isn't that something that a jury ought to have a chance to look at to determine whether what was done here was reasonable? Well, no, for also another reason. But I think that looking at the current address and following that lead down and then moving on to the next line, which is prior addresses, is reasonable as a matter of law. Well, I don't know if you're right about that's a matter of law. You think it's reasonable. The question is whether that's something that the trier of fact should determine, whether it's reasonable. Well, I think they couldn't in this case because then we reached the question of immunity, government code immunity, for how you conduct an investigation. And they took one lead and followed that through, and then they went to the second level. What immunity are you talking about here? I mean, the government code says, as I cited in Davila, that the coroner has a mandatory duty to make a reasonable attempt to locate the deceased's family. You're saying that notwithstanding that construction of the government code, that the people are immune here from any liability if they do not act reasonably? Well, there's two points there. One, I don't think Davila is good law anymore on mandatory duty because the law has changed since Davila. Guzman, the Supreme Court, California Supreme Court, it narrowed what can be in a mandatory duty. For example, if there's any discretion in the statute for how to conduct the function that's supposedly mandatory, it's not a mandatory duty. So, for instance, a sheriff shall serve a writ, has discretion of when and how to serve it, it's not a mandatory duty just because it says shall. Davila turned on the word shall and implied a duty. The California Supreme Court has since said, and we have it in a case in our brief, you don't imply mandatory duties. It has to be spelled out. The guidelines have to be spelled out. Your position is that Guzman overruled Davila? Essentially, yes. And your position then would be that even if they had made, even if the coroner's office had made no attempt that they would be immune? No, it is not that. Okay, let me keep going then. Your position is then that if they had not made a reasonable effort, they are still immune? The immunity attaches to the choices they make in conducting the investigation. I'm trying to see where this is going. The statute says they shall make a reasonable effort. And if the facts of the case are such that I as a juror conclude they did not make a reasonable effort, are you saying that the county is nonetheless immune? Yes, I think they would be because on these facts where they did something. No, no, no, I'm not asking you that. I, the juror, say, you know, you had that DMV information at the latest on the March 27th, and that DMV information included the address where they eventually were able to contact the parents as soon as they did it. But it took them 19 days or perhaps more if they got it on the 26th in order to do that. I, the jury, say, you know, that's just not reasonable. You're saying because they did some other investigation that, in my view as a juror, was incomplete and unreasonable, you're saying nonetheless they're immune? Yes, I would be saying that. In other words, you're saying that the concept of reasonableness in the statute is in effect a nullity as a result of Guzman. There's no meaning to it. If you can't explore whether what they did was reasonable, then there's no point in having the statute. Well, the statute isn't really about a duty to investigate. It's about when can you bury the body. Well, that's a different issue. Right. But that's a very different issue here. This is a statute that says what the coroner has to do. The earlier case, Davila, says that's a mandatory duty. You've got to do it. You're saying that Guzman nullifies that and that basically any concept of what might be reasonable is simply irrelevant because you're immune if you take some action and if it's part of that normal procedure, in quotes, then there's no liability. Is that correct? I think that's correct. I mean, the rule in California is immunity and the exception is liability. And so, yes, that would be correct. Okay. Let me ask you one last question. I think I know the answer to it. And that is if we were to find that the employee did not act consistent with the statute, is there a response to get superior liability on the county? The county under 815.2, if the employee is negligent, the county can be vicariously. That's my question. Yeah. Okay. I thought that was the answer. I just was worrying that maybe there was a Manel argument buried into what the county was responsible for under state law. I did not think it was so, and you've just answered that. All right. Thank you. Thank you. Now, you've got a minute in hand. Why don't you respond? Let's put four minutes on the clock and see where we go. Your Honor, I'm going to attempt to work my way backwards subject matter-wise. Starting with the county. To answer the question, yes, the address was there the entire time, and it wasn't the only address that was there the entire time. There were three addresses that were in the file the entire time. And what the county did, apparently, was try to send one letter out and wait for a response to that letter before it sent the next letter, instead of just putting three stamps on three letters and sending them out simultaneously or running three addresses, which the PMK for the county testified would have taken a few seconds if they had been run through accurate. These types of circumstances and that situation is definitely something that should go to a jury. As a matter of fact, the Ninth Circuit has addressed this question in a very similar case called Mundy, and Mundy versus the United States. The FBI was trying to claim that because it overlooked a document in a file that someone submitted for a security clearance, it should get a pass on a negligence claim. The Ninth Circuit says no. Overlooking a document in a file that you should see because it's right there raises a question of whether or not your conduct is reasonable. And that's what Cato indicated, was it had been overlooked, in quotes, right? The exact word, yes, Your Honor. So in this case, I gather that you strongly disagree with the county's perspective that Goose Bot overrules Davila and that this, whether or not the county acted responsibly, goes back to a jury. Absolutely. As a matter of fact, what the county's arguing is essentially that a reasonableness standard is transformed somehow into a subjective standard rather than an objective one, and that's just not true. It's subject to an objective determination by a jury as to whether it was reasonable. The other issue with regard to the county is that the district judge made the determination erroneously that parents do not have a post-death interest in the children that they have, that they don't have an interest in the remains, no 14th Amendment interest in the remains of their children. That was an erroneous determination. The district court relied on Troxell and said that based on Troxell, he was not going to extend. What about that Perryman case? Perryman? It's a court of appeal decision, which I thought was directly on point, saying that there is a property interest, if I'm understanding where you were going with this, in you getting back the remains so that you can have the right to decide how the burial is going to take place and that kind of thing. But beyond that, there's no state law protected property interest that parents have. I must admit I'm not familiar with the Perryman case, but I also agree. We're not contesting the state law interest determination. What we're speaking of is the 14th Amendment interest that exists, as explained by Newman v. Saffief Agus Warren, and also a moment of the court's indulgence, Marsh v. County of San Diego. As a matter of fact, in Marsh v. County of San Diego, the Ninth Circuit went so far as to not only recognize a liberty and property interest that the parents have in the remains of their children as far as disposal of the remains, but also as far as control over images of the remains. Can I ask you this, counsel? Certainly. I understand you're making a 14th Amendment argument, but as you know, under California law and under California case law, it's been clear that parents have no right to stop a coroner from performing an autopsy, to remove organs, or to even handle a body in a disrespectful and undignified manner. That's by California case law. Are you saying that notwithstanding that state law element, that there is a separate 14th Amendment right on the part of the parents to control what is done with the body? If there is, I'd sure like to know what the case law is, because I haven't found it. Can you help me with that? What we're saying is that there is indeed a 14th Amendment interest in the parents of controlling the disposition of the children's remains, and that interest in controlling the disposition encompasses making decisions about how, when to bury, and those types of things, and that if that interest is interfered with, that is a constitutional injury. So, for example, in this case, we have this massive county with millions and millions of people of many, many different faiths and different traditions as to how bodies should be dealt with. Is it your view that, notwithstanding the size of the county, the number of people involved, that in a situation like this, the fact that Usman's body was not returned to his parents within the time, and I don't trust any expertise, I know there's a certain number of days that the body is supposed to be buried. If that doesn't happen, there is kind of a per se constitutional violation. Is that your view? Not precisely. What we're saying is that if the body isn't returned in time for anyone, regardless of their religion, to reasonably dispose of and exercise control over their child's remains, that there is an infringement on that 14th Amendment interest, and this is why we say that. If you look at the testimony of the county's PMK, what he says are a couple of very important things. One is that the county knows that from the moment a body comes in, it's decaying, and the condition of it is getting worse and worse. He also says that the county has, the coroner's office has absolutely no policies as far as what ought to happen first, what ought to happen by when, and there's no disciplinary policy in place in case something doesn't happen when it should. What that evinces is, we contend, a very obvious need for a change in policy that affects, because you serve millions of people of different faiths, people that you know you may injure the rights of. It's kind of like a classic city of Canton argument, and on top of that overlay in Oviatt v. Pierce argument, it's a policy of inaction, and the coroner's office just can't maintain that kind of policy, knowing that it causes this kind of constitutional injury. That's essentially our argument. As far as you're well over, if you want to sum up. Okay, just to sum up, attorney's fees, the court abused its discretion. The trial court came up with its own rate, its own hourly rate, not based on anything in the community, which with Gonzalez v. Maywood doesn't work, and the court also came up with double hourly cuts. So we would dispute that. And with that, thank you very much.
judges: Fletcher, Smith, Watford